**Affirmed and Opinion filed April 23, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00281-CV

### IN THE INTEREST OF M.E.H.

**On Appeal from the 345th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-AG-15-002375**

## O P I N I O N

In this appeal from a final order based on a mediated settlement agreement ("MSA") in a child custody dispute, a mother contends the MSA and the trial court's order incorporating its terms contain provisions conditioning her rights of possession and access on payment of child support in violation of public policy. She urges that the MSA, together with all orders flowing from it, should be set aside entirely as void. She further asserts that the trial court abused its discretion by signing an order that deviates substantially from the MSA's terms. After thorough review of the record, we conclude that Mother's issues lack merit. We affirm the trial court's judgment.

## Background

Mother and Father are the parents of M.E.H., a male child who was born in June 2015. The Office of the Attorney General initiated a suit to determine parentage and requested orders for support and conservatorship. On February 3, 2016, Mother and Father entered into a mediated settlement agreement, which named them M.E.H.'s joint managing conservators, awarded Mother the right to determine M.E.H.'s residence within Travis County, and awarded both parties possession of M.E.H. On February 17, the trial court signed an "Order in Suit Affecting the Parent-Child Relationship" (the "First SAPCR Order") incorporating the agreement's terms and establishing a parent-child relationship between Father and M.E.H.

The following month, Father filed a petition to modify the parent-child relationship and requested temporary orders. He sought a temporary restraining order preventing Mother from possessing M.E.H unsupervised and from possessing a firearm when M.E.H. was in her custody. He requested temporary orders: (1) granting him the temporary exclusive right to determine M.E.H.'s residence; (2) ordering Mother's psychological and psychiatric evaluation; (3) appointing a guardian ad litem; (4) enjoining both Father and Mother from applying for or obtaining a passport for M.E.H.; (5) ordering that exchanges of possession be supervised; and (6) ordering the parties to communicate solely through the "Family Wizard" application, except in the event of an emergency involving M.E.H. As grounds for the requested restraining order, Father alleged that M.E.H.'s "present circumstances would significantly impair the child's physical health or emotional development." In an affidavit attached to the petition, Father stated that, since entry of the First SAPCR Order, Mother "has been very emotional, threatening, angry, volatile and physical, at times." He stated that she denied him access to M.E.H. on "numerous occasions," including one instance when she hit him with a closed fist.

2

Additionally, Father averred that Mother offered to let him have M.E.H. "permanently" because she had bought a gun and was going to kill herself. Father's mother provided an affidavit in which she confirmed Mother's recent emotional and volatile behavior, including Mother's refusal to relinquish M.E.H. to Father at several exchanges. Mother's behavior during exchanges often caused M.E.H. distress. She also stated that Mother recently expressed that she was "sad and depressed" and was "having a hard time being a mother."[1]

The trial court signed a "Temporary Restraining Order and Order Setting Hearing for Temporary Orders" on March 28 (the "TRO"). The TRO restrained Mother from: (1) possessing M.E.H. unless supervised by M.E.H.'s maternal grandparents; (2) taking possession of M.E.H. from Father; (3) contacting Father in a threatening or harassing manner; (4) going to Father's residence; and (5) possessing a firearm while exercising custody over M.E.H. The trial court ordered Mother to appear at a hearing for temporary orders on April 1.

At the hearing, Father testified about the ongoing conflicts with Mother during his attempts to exercise possession of M.E.H. He also described a phone call during which Mother told him she was going to commit suicide. The court admitted into evidence an audio recording of the call. The court also admitted a video recording of an incident during which Mother became extremely upset and yelled at Father, delayed relinquishing M.E.H. to Father, and stated that Father's treatment of Mother made it difficult for Mother to be present for M.E.H. Mother testified that she

---

[1] Simultaneously with his petition to modify, Father filed a motion for enforcement of possession or access, in which he alleged that Mother had violated the First SAPCR Order fourteen times, including violations ranging from denying Father access to M.E.H. or delaying the start of Father's possession of M.E.H. to Mother yelling at Father and using profanity during exchanges. He requested that Mother be held in contempt and sentenced to 180 days in jail, with the sentence suspended pending her full compliance with all court orders. It does not appear that Father set this motion for hearing, and he later amended it to add numerous additional alleged violations.

3

threatened suicide because she felt overwhelmed and sought attention from Father. She disagreed that most exchanges had been difficult, although she acknowledged that during the exchanges she often became angry with Father.

The trial court signed temporary orders giving Father the temporary exclusive right to designate M.E.H.'s residence and providing Mother with supervised possession of M.E.H. during the weekdays and overnight one weekend night. The court ordered the parties to communicate solely through "Family Wizard" except in the event of an emergency, enjoined Mother from going to Father's residence, and enjoined Mother from possessing a firearm when she had possession of M.E.H.

At a hearing about two weeks later, a psychotherapist testified that, after interviewing Mother, he did not believe Mother was a danger to herself or others and she could care for M.E.H unsupervised. Based on the doctor's testimony, the trial court signed additional agreed temporary orders, in which the court found that Mother was "not an immediate danger to herself or others" and that her visitation with M.E.H. no longer required supervision. Additionally, the court returned to Mother the exclusive right to designate M.E.H.'s residence within Travis County. The parties agreed that Father's possession of M.E.H. would occur overnight on Tuesdays and Thursdays and alternating Fridays. The parties agreed to exchange M.E.H. (without communicating with each other) at a neutral location midway between their residences. Mother was to have possession of M.E.H. at all other times. The court ordered Mother to begin therapy with a psychotherapist as soon as possible.

Together with the agreed temporary orders, the trial court appointed by agreement a guardian ad litem. The guardian ad litem was to recommend: (1) the appropriate psychotherapist for Mother's treatment, if the parties could not agree on one; (2) whether additional or different treatment was needed to facilitate the

4

relationship between Mother and M.E.H.; (3) if the parties could not agree, an appropriate possession schedule for M.E.H. pending a final trial; and (4) anything else that would "facilitate the continued bonding and relationship between the child and both father and mother." The guardian ad litem filed a report with the court.

Father filed a "Motion for Guardian ad Litem Review" and set it for hearing. During the hearing, the guardian ad litem reported to the court that she was "very concerned" about Mother's behavior. She explained that Mother reported "alarming" things to her that later proved incorrect, such as that M.E.H. lost weight during his time with Father. When the guardian ad litem attempted to verify the assertion with M.E.H.'s pediatrician, the doctor reported no decline in M.E.H.'s weight. The guardian ad litem advised that Mother should stop making unsupported accusations against Father. Also, the guardian ad litem described the exchanges between the parents as "horrible" and stated that she was "really worried about this little boy." The trial court stated during the hearing that if Mother could not abide by court orders, she risked losing primary custody of M.E.H. At the hearing's conclusion, the trial court orally modified the possession schedule, giving Father expanded exclusive possession of M.E.H. on Tuesdays at 5:30 p.m. to Thursday at 9:15 a.m., as well as the first, third, and fifth weekends from Saturday at noon to Monday at 9:15 a.m. The exchanges were to be supervised at a local facility. The new possession schedule was to take effect on August 16. The court also ordered Mother to submit to a full psychological evaluation.[2]

Shortly after the hearing, Mother took M.E.H. to Mexico without informing Father. Her departure from the country with the child prompted another round of motions by Father. First, Father filed a "Motion for Issuance of Writ of Attachment,"

---

[2] Mother's previous psychological evaluation, discussed above, was limited to the issue of whether she posed a danger to herself or others after her suicide threat.

5

in which Father requested a writ of attachment ordering that M.E.H. be brought before the court immediately and returned to Father. The trial court issued a writ of attachment on August 17, but deputies were unable to locate Mother to serve the writ.

Father then sought new temporary orders and another temporary restraining order. He asked the court to appoint him M.E.H.'s temporary sole managing conservator, enjoin Mother from access to or possession of M.E.H., and order Mother to pay monthly child support. The court signed a TRO and set a hearing for temporary orders. In the TRO, the court immediately restrained Mother from possessing M.E.H. and taking M.E.H. from Father, from communicating with Father or his family in a "disparaging, threatening or harassing manner," from going to Father's residence, and from possessing a firearm while M.E.H. was in her possession.

At an August 24 hearing, Father's attorney stated her understanding that Mother had been in Mexico but was returning to Austin. The court reset the temporary orders hearing for August 31. At that hearing, which Mother failed to attend, the guardian ad litem testified that, after the August 10 hearing, she observed Mother to be "extremely distraught, crying loudly," and "making a lot of noise out in the hallway. . . ." She also testified that she was concerned about M.E.H., and that she believed that Mother's visitation with him should be "carefully supervised in a safe environment." She again described several examples of Mother's assertions against Father, such as claiming that Father had beaten Mother and bruised her face and that Father was a drug addict. The guardian ad litem investigated Mother's allegations, but none proved true. Also testifying at the hearing were Mother's parents. When questioned about their communication with Mother or where she was, they both asserted their Fifth Amendment privilege and refused to answer. The

6

court admitted into evidence text messages between Mother and her parents, which indicated that Mother had intentionally fled the area with M.E.H. to avoid compliance with the court's orders. At the hearing's close, Mother's counsel reported to the trial court that Mother represented to him that she would be returning to the U.S. and sought to recess the hearing for two days to permit her to appear. When the hearing reconvened on September 2, however, Mother again failed to appear.

After these hearings, the trial court signed "Further Temporary Orders," granting Father's requested relief. The trial court found that Mother: (1) removed M.E.H. from the court's jurisdiction in violation of the court's orders; (2) hid and secreted M.E.H. from Father; and (3) endangered and impaired ME.H.'s physical and emotional well-being. The trial court awarded Father attorney's fees of $134,500, to be paid by September 30.

Mother was apprehended in Mexico on September 10, and she and M.E.H. returned to Texas. The parties filed a number of further motions and entered into additional agreements, culminating in a Rule 11 agreement that the parties would mediate their dispute.

The parties mediated and signed the MSA at issue. Among other things, the MSA addressed Father's and Mother's rights and duties regarding conservatorship, possession, and access. The MSA outlined Mother's rights, which generally increased over time in "phases" (for conservatorship) and in "steps" (for possession and access). For example, pertaining to possession and access, "step one" ran from the MSA's date until October 7, 2018—a period of just over fourteen months. During that time, Mother was to have professionally supervised or family-accompanied visitation with M.E.H. on all specified dates and times, except for identified dates during the holidays. Father agreed to pay 50% of the professional

7

supervision fees incurred until April 1, 2018.[3]  If professional supervision was required beyond that date, Mother agreed to pay 100% of the supervision fees. Mother's rights to and duration of possession was to "step up" over time, culminating in an expanded standard possession order to begin in June 2020, if Mother complied with certain provisions.

Under the MSA, Mother agreed to pay $300 in monthly child support and $100 in monthly medical support, plus 50% of monthly daycare bills.  Mother agreed that if she violated among other terms the child support obligations, she reverted to "step one" of her agreed possessory rights and to "phase one" of her conservatorship rights as of the date of the violation.  The parties agreed that if Mother disputed whether a violation of the MSA occurred, "she must set a hearing to determine whether there was a violation."  Mother also agreed that she would be held in contempt for the visitation violations that occurred when she took M.E.H. to Mexico and sentenced to 120 days in Travis County jail.  The sentence was to be suspended pending compliance with the terms of the MSA for two years after entry of the order. Mother also agreed to pay $41,951.50 in attorney's fees as child support.  The parties agreed that a "Children's Bill of Rights" would be included in the final order.  They also agreed that their mediator would "arbitrate drafting disputes and any disputes regarding details of this agreement not addressed."

Thereafter, the parties attempted to agree on orders incorporating the MSA terms, without complete success.  The parties submitted several drafting disputes to arbitration, and the arbitrator issued a ruling.  Father sought to enter final orders on the MSA, and the trial court signed an "Order in Suit to Modify Parent-Child

---

[3] Beginning April 1, 2018, a member of Mother's immediate family rather than a professional supervisor would be present during visitation.

Relationship" based on the MSA (the "Second SAPCR Order"), which is the subject of this appeal. Mother timely appealed.

## Analysis[4]

Mother challenges the Second SAPCR Order in two issues: (1) whether the MSA is void because it allegedly conditions her possessory rights on payment of child support in violation of public policy; and (2) whether the trial court erred by rendering the Second SAPCR Order when substantive differences exist between the order, the MSA, and the arbitration award.

## A. Validity of the MSA

### 1. *Standard of Review and Governing Law*

We review a trial court's decision to render judgment on an MSA under Texas Family Code section 153.0071 for an abuse of discretion. *In re C.C.E.*, 530 S.W.3d 314, 319 (Tex. App.—Houston [14th Dist.] 2017, no pet.). An MSA is binding on the parties if the agreement:

> (1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;
>
> (2) is signed by each party to the agreement; and
>
> (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

*See* Tex. Fam. Code § 153.0071(d). If an MSA meets these requirements, a party is entitled to judgment on the MSA notwithstanding Rule 11 of the Texas Rules of Civil Procedure or another rule of law. *See id.* § 153.0071(e). A court may decline

---

[4] The Supreme Court of Texas transferred this case to our court from the Third Court of Appeals. *See* Tex. Gov't Code § 73.001. We are unaware of any conflict between Third Court of Appeals precedent and that of this court on any relevant issue. *See* Tex. R. App. P. 41.3.

9

to enter judgment on an MSA only under certain proscribed circumstances. *See id.* § 153.0071(e-1).[5]

For public policy reasons, the Family Code precludes a trial court from rendering an order that "conditions the right of a conservator to possession of or access to a child on the payment of child support." Tex. Fam. Code § 153.001(b). When parties consent to such a condition in a mediated settlement agreement, the provision contravenes public policy as reflected in section 153.001(b).[6] *See In re A.N.H.*, 70 S.W.3d 918, 920 (Tex. App.—Amarillo 2002, no pet.). Because such provisions offend public policy, they are void. *See id.*; *cf. also McCreary v. Bay Area Bank & Trust*, 68 S.W.3d 727, 733 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd) (contracts that violate public policy are void). A trial court is not required to enforce provisions of an MSA that are void as against public policy. *See In re C.C.E.*, 530 S.W.3d at 320; *In re Lovell-Osburn*, 448 S.W.3d 616, 622 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding).

2. *Application*

Family Code section 153.001(b) forms the basis of Mother's first issue. She cites three specific provisions of the MSA (incorporated into the Second SAPCR Order), which she says impermissibly condition her right of possession of and access to M.E.H. on the payment of child support. According to Mother, because any or all of the allegedly offending provisions violate public policy and are void, the entire

---

[5] The MSA in today's case meets section 153.0071(d)'s requirements and Mother does not claim otherwise. Nor does she contend that one of the circumstances in section 153.0071(e-1) applies.

[6] A state's public policy is embodied in its constitution, statutes, and the decisions of its courts. *Wright v. Sydow*, 173 S.W.3d 534, 551 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).

MSA is void.  Mother urges us to vacate the MSA and reverse the Second SAPCR Order because it is based on the void MSA.

### a. Provision One

The first challenged provision is contained in the "possession and access" section of the Second SAPCR Order.  That section describes Mother's possession and access rights in a series of four "steps."  Mother's bundle of rights expands with each progressive step, from step one to step four.  Step one describes the "floor" or minimum possession and access rights Mother enjoys under the order.[7]  After a

---

[7] Mother's step one possessory rights are described as:

(c)    Possession Schedule

Except as otherwise expressly provided in this Possession Order, IT IS ORDERED that [Mother] shall have the right to possession of the child as follows, subject to the compliance provisions stated hereinbelow:

1.    **Step One**

On Tuesday and Thursday of each week beginning at 4:30 p.m. and ending at 7:30 p.m.  If [Mother] is prevented from beginning her period of possession at 4:30 p.m. due to her work schedule, she shall give written notice to [Father] and the supervisor at least 48 hours in advance, in which case the period of possession will begin at 5:30 p.m.

On Sundays following the first, third and fifth Fridays of each month beginning at 9:00 a.m. and ending at 7:00 p.m.

Mother's Day in all years – IT IS ORDERED that [Mother] shall have the right to possession of the child on Mother's Day beginning at 9:00 a.m. and ending at 7:00 p.m. that same day.

Father's Day in all years – IT IS ORDERED that [Father] shall have the right to possession of the child on Father's Day beginning at 9:00 a.m. and ending at 7:00 pm. That same day.

Thanksgiving Holiday – IT IS ORDERED that [Mother] shall not have the right to possession of the child on Tuesday or Thursday during the week of Thanksgiving.

IT IS ORDERED that [Mother] shall have the right to possession of the child beginning at 3:00 p.m. on December 24 and ending at 3:00 p.m. on December 25, only if at least three (3) family members (in addition to [Mother]) are present with the child at all times during the period of possession.  If at least three (3) family members are present, this Christmas period of possession will not need to be

11

designated amount of time, Mother's rights increase to those described in step two, and so on. Mother's progression to each successive step's increased possession and access rights is contingent upon her compliance with certain conditions. The relevant condition here is Mother's timely payment of child support. She is required to comply with that condition at all times, and if she fails to comply her rights of possession and access immediately return to those described in step one until she has complied with all orders for nine consecutive months after the time of the violation.[8]

### b.    Provision Two

The second challenged provision pertains to an additional requirement of Mother's step one possessory rights. With the exception of certain holiday periods,

---

professionally supervised. If three (3) family members cannot be present for the entirety of the visit, then the visit will need to be professionally supervised or forfeited.

*** 

Step One will last until April 1, 2018 or until [Mother] has fulfilled the conditions for moving out of Step One as listed herein.

[8] The relevant provisions provide:

**Compliance Provisions for Possession and Access**

IT IS ORDERED that [Mother] shall comply with the following terms and conditions at all times, as applicable:

1. *[Mother]'s timely payment of child support* . . . The payment is considered late if not received by the Office of the Attorney General/State Disbursement Unit and the daycare provider by the 10th of the month . . . .

*** 

In the event that [Mother] has failed to comply with the terms and conditions stated above, IT IS ORDERED that [Mother]'s periods of possession will immediately return as ordered in the section above entitled "Step One" until [Mother] has complied with all orders for nine consecutive months after the time of the violation. . . . If [Mother] is still in Step One and commits a violation, then the nine-month compliance period will begin again beginning on the day of the violation. . . .

(Italics added).

Mother's periods of possession during step one must be professionally supervised. Until April 1, 2018, Mother and Father each are responsible for 50% of the professional supervision cost. If supervision continues past April 1, 2018, then Mother is responsible for 100% of the cost.[9] Mother argues that the requirement that she be restricted to professionally supervised visitation at her expense violates section 153.001(b) because "a failure to pay child support triggers an additional monetary obstacle (supervision fees) to the possession and access of the child as a direct punitive measure for failing to pay child support in violation of §153.001(b)."

      c.     Provision Three

The third challenged provision is contained in the "conservatorship" section of the Second SAPCR Order. Here again the order describes Father's and Mother's respective rights and duties in a series of "phases" over time. During "phase one," for example, Father is appointed sole managing conservator, and Mother has conservatorship duties. During phases two and three, Father and Mother are appointed joint managing conservators, and Mother has certain enumerated rights.

---

[9] The relevant provision provides:

    **Supervision during Step One** – IT IS ORDERED that the following provisions apply for supervision during Step One:

1.    [Mother]'s periods of possession shall be supervised at all times by Rhonda Hohmann, Laura Johnson, or another mutually agreed upon or court ordered professional supervisor. [Mother] IS ORDERED to follow all written rules of the supervisor; . . .

5.    Until April 1, 2018 – [Father] and [Mother] shall each timely pay and be responsible for 50% of the cost of the professional supervisor directly to the supervisor. If supervision continues past April 1, 2018, [Mother] is ORDERED to timely pay and be responsible for 100% of the supervision fees; . . .

The right at issue arises during phase three and states that Mother has the right to attend school activities.

Similar to the conditions applicable to the possession and access provisions, Mother's conservatorship right to attend school activities in phase three is conditioned on timely payment of child support. She is required to comply with that condition at all times, and if she fails to comply her duties and rights of conservatorship immediately return to those described in phase one until she has complied with all orders for nine consecutive months.[10]

###### d.    Discussion

Initially, we address Father's argument that Mother failed to preserve the contentions in her first issue because she did not raise them in the trial court. In her reply brief, Mother directs us to her "Motion to Vacate Mediated Settlement," which she says contains arguments "sufficient to encompass" her appellate positions. Further, she argues that the trial court prevented her from presenting evidence at the hearing on her motion. For the sake of argument, we will presume, without deciding,

---

[10] The relevant provisions state:

**Compliance Provisions for Conservatorship**

IT IS ORDERED that [Mother] shall comply with the following terms and conditions at all times, as applicable:

2.   *[Mother]'s timely payment of child support* . . .  The payment is considered late if not received by the Office of the Attorney General/State Disbursement Unit and the daycare provider by the 10th of the month;

***

In the event that [Mother] has failed to comply with the terms and conditions stated above, IT IS ORDERED that [Mother]'s conservatorship/rights and duties will immediately return to as ordered in the section above entitled "Phase One" until [Mother] has complied with all orders for nine consecutive months. . . .

(Italics added).

14

that Mother preserved her argument that the MSA should be vacated and the Second SAPCR Order reversed because the three provisions she cites violate public policy under section 153.001(b) and are void. *See Douglas-Peters v. Cho, Choe & Holen, P.C.*, No. 05-15-01538-CV, 2017 WL 836848, at *21 (Tex. App.—Dallas Mar. 3, 2017, no pet.) (mem. op.) (presuming party preserved argument that contract violated public policy); *In re Guardianship of Parker*, 329 S.W.3d 97, 104 n.14 (Tex. App.—Amarillo 2010, pet. denied) (assuming preservation of error).

Mother cites several cases for the proposition that parties may not contract against public policy and that such agreements are void. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004); *accord Sonny Arnold, Inc. v. Sentry Sav. Ass'n*, 633 S.W.2d 811, 815 (Tex. 1982); *Curlee v. Walker*, 244 S.W. 497, 498 (Tex. 1922); *James v. Fulcrod*, 5 Tex. 512, 520 (1851). Further, relying on this court's decision in *In re C.C.E.*, Mother argues that the trial court should not have rendered judgment on the MSA because the three provisions violate public policy and thus the entire MSA is void. *In re C.C.E.*, 530 S.W.3d at 320.

In *In re C.C.E.*, the parties agreed in a mediated settlement agreement that child support obligations would not increase for a certain period of time. *See id.* at 316. The trial court signed an agreed order incorporating this provision. *See id.* at 317. The mother appealed, claiming that the MSA was void because the provision was illegal and against public policy. *See id.* at 318. This court assumed without deciding the provision's invalidity on public policy grounds, but we declined to void the entire MSA. *See id.* at 320. Because the mother failed to assert on appeal that the ostensibly void provision could not be severed so that the remainder of the MSA was enforceable, we overruled her appellate complaint in which she sought to set aside the complete MSA. *See id.*

15

Here, we will presume, but expressly do not decide, that the three challenged provisions violate public policy under section 153.001(b). Indulging that presumption, however, "does not mandate the conclusion that the entire Agreement is void or unenforceable. . . ." *Id.* "Generally, if a provision in an agreement is illegal or violates public policy, the provision may be severed if it does not constitute the essential purpose of the agreement," even when, as here, the agreement lacks a severability clause. *Id.* Severability is determined by the intent of the parties as evidenced by the language in the contract. *Id.* The issue is whether the parties would have entered into the agreement absent the provision at issue; so, "to decide the severability issue in the absence of a severability clause, the court must determine the central and essential purpose of the agreement." *Id.*

Mother urges that the challenged provisions are not severable from the MSA as a whole because they constitute the agreement's central and essential purpose. Mother contends that inclusion of the child support conditions was "retaliatory" on Father's part because the Attorney General earlier obtained a child support order against him, and that Father aggressively pursued custody "likely" in retaliation for the child support order. Mother says it is "plausible" that Father would not have agreed to the MSA at all in the absence of the challenged provisions regarding Mother's obligation to pay child support.

Neither a fair reading of the MSA's plain language nor the record supports her assertion. Nothing in the MSA's language or otherwise indicates the parties would not have entered into the agreement absent the disputed provisions. The MSA states its general purpose broadly as "[t]he parties wish to avoid potentially protracted and costly litigation." The MSA did not resolve only the three matters covered by the challenged provisions Mother cites, but included over four pages of terms by which the parties settled multiple issues of conservatorship rights and

16

duties, possession of and access to M.E.H., the amount of child support owed and detailed obligations concerning payment including in particular medical and daycare costs, name changes, the enforcement of prior orders and attorney's fees, mutual injunctions, and the inclusion of a children's bill of rights in the final order. As well, the MSA provided, "All claims and controversies between all parties will be resolved and released by this agreement, including the claims [for aiding or assisting in interference with child custody] against [Mother's parents]." The parties also agreed on matters relating to Mother's violations of prior orders, including that Mother was in contempt for the visitation violations that occurred when she fled to Mexico with M.E.H. and that she would be sentenced to 120 days in Travis County jail (which the court suspended on certain conditions in an effort to prevent any such future violations). Moreover, the timely payment of child support was merely one of many orders with which Mother was required to comply to benefit from the suspended sentence and step up of conservatorship and possession rights. For example, she was required to attend therapy for at least five years, communicate with Father only through Family Wizard, follow all written rules of the professional supervisor, surrender her passport to M.E.H.'s maternal grandfather (which could only be returned to Mother if Father had possession of M.E.H.), not remove M.E.H. from Father other than at court-ordered times, comply with all criminal bond and probation terms, and not possess firearms. Non-payment of child support was but one violation that would revert Mother back to phase one of conservatorship rights or step one of possessory rights, or potentially land her in jail. The MSA contains no term identifying the challenged provisions as central or essential, and the record otherwise reveals no evidence from Mother or Father supporting that assertion. Viewing the intent of the parties as evidenced by the language in the contract, we conclude that the three provisions Mother cites do not constitute the central and

17

essential purpose of the MSA such that the parties would not have entered into the MSA absent those terms. *In re C.C.E.*, 530 S.W.3d at 320.

Mother also asserts that she was coerced into signing the MSA and suggests that "no reasonable person would conclude that [a] nursing mother would sign an agreement this oppressive without the use of duress or coercion." Mother did not prove coercion in the trial court or raise it on appeal as an independent ground of error for reversing the Second SAPCR Order, but even accepting her contention as true Mother fails to explain how her assertion supports the critical question whether the parties would have entered into the MSA absent the specific provisions at issue.

Mother has not shown that the three challenged provisions constitute the central and essential purpose of the MSA. Therefore, those provisions are severable. Mother, however, does not argue here and did not argue below that the trial court should have severed them and enforced the remainder of the MSA. She challenges the MSA as a whole. The only authority Mother discusses in support of her non-severability argument is this court's opinion in *In re C.C.E.* As explained, this court overruled a mother's claim that a mediated settlement agreement was void as against public policy when she failed to show that the provisions at issue were not severable. *See id.* at 320-21. Likewise, here, Mother has failed to show that the provisions she challenges were not severable and therefore that the MSA is void. *See id.*

We thus overrule Mother's first issue.

**B. Challenge to the Second SAPCR Order Based on "Substantive Differences" with the MSA and the Arbitration Award**

In her second issue, Mother contends the trial court erred in rendering the Second SAPCR Order because some of the order's terms vary materially from the MSA terms as contained in the writing or as determined by the arbitrator.

18

1.    *Applicable Law*

A final judgment rendered pursuant to an MSA must be in strict or literal compliance with that agreement. *E.g.*, *Kramer v. Kastleman*, No. 03-13-00133-CV, 2017 WL 5119211, at *7 (Tex. App.—Austin Nov. 3, 2017, pet. denied) (mem. op.) (citing *Chisholm v. Chisholm*, 209 S.W.3d 96, 98 (Tex. 2006) (per curiam)).  Parties need not agree to all terms necessary to effectuate the purposes of the agreement, but they must agree on all *material* terms.  *Id.*  "A judgment is not in 'strict or literal compliance' with the terms of the agreement if it improperly removes or adds material terms."  *Id.*  Nonetheless, a trial court does not reversibly err in modifying the terms of an MSA if those modifications do not add terms, significantly alter the original terms, or undermine the parties' intent.  *Wallace v. McFarlane*, No. 01-10-00368-CV, 2013 WL 4507843, at *8 (Tex. App.—Houston [1st Dist.] Aug. 22, 2013, no pet.) (mem. op.).  "Further, in entering judgment on an MSA, trial courts may include terms necessary to effectuate and implement the parties' agreement so long as they do not substantively alter it."  *In re Lee*, 411 S.W.3d 445, 458 n.17 (Tex. 2013) (internal alterations omitted).

Additionally, the MSA contains an arbitration clause stating that the arbitrator "will arbitrate drafting disputes and any disputes regarding details of this agreement not addressed."  The parties submitted various disputes to the arbitrator, who issued a ruling.  Review of an arbitration award is "extraordinarily narrow," and we must indulge every reasonable presumption in favor of upholding the arbitration award. *See Cooper v. Bushong*, 10 S.W.3d 20, 24 (Tex. App.—Austin 1999, pet. denied). Under the Family Code, the trial court must enter an "order reflecting the arbitrator's award" unless it finds the award not in the best interest of the child.  *See* Tex. Fam. Code § 153.0071(b).

2. *Application*

Mother lists twelve alleged "substantive differences" between the Second SAPCR Order and the MSA or the arbitration award. Mother groups the alleged differences into three general categories. First, she says "substantive difference one" is that the order does not include a "full" children's bill of rights, as ordered by the arbitrator. Second, in "substantive differences two through four," she contends the order includes language pertaining to the supervision rules applicable during her periods of possession that the arbitrator refused. Third, in "substantive differences five through twelve," she argues the order contains "disputed language" neither included in the MSA nor submitted to the arbitrator.

a. Alleged substantive difference one

Mother contends that "substantive difference one" was submitted to arbitration, and that the relevant provisions of the Second SAPCR Order differ materially from the arbitrator's decision. The arbitrator ruled that a "full Children's Bill of Rights needs to be in the Order." Mother contends that the Second SAPCR Order contains not a "full" children's bill of rights but only a partial one. As support, Mother directs us for comparative purposes to the First SAPCR Order, which she construes as containing a "full" children's bill of rights. The First SAPCR Order provides a children's bill of rights that contains more provisions than those recited in the Second SAPCR Order. However, the First SAPCR Order does not state that it contains a "full" children's bill of rights. The arbitrator, in any event, did not refer to the First SAPCR Order in his arbitration award and did not define what was intended by a "full" children's bill of rights. Instead, the arbitrator referred to an April 19, 2017 order, which includes some of the same children's bill of rights provisions that are included in the Second SAPCR Order. Without more information, we cannot say that the bill of rights provisions contained in the Second

20

SAPCR Order are an abuse of discretion. For example, Mother does not identify with citation to authority the terms she contends ought to be included in a "full" children's bill of rights but were excluded from the Second SAPCR Order. We cannot say what provisions of a purported "full" children's bill of rights are allegedly missing or whether any such provisions alter the parties' original intent in signing the MSA. As our record does not contain text purporting to be a "full" children's bill of rights,[11] we conclude Mother has not presented sufficient information and authority to support reversal. *See* Tex. R. App. P. 38.1(i); *Stillwell v. Stillwell*, No. 03-17-00457-CV, 2018 WL 5024022, at *5 (Tex. App.—Austin Oct. 17, 2018, pet. denied) (mem. op.) (explaining that Father inadequately briefed complaint about Children's Bill of Rights contained in divorce decree because he did not identify any missing wording, provide any analysis, or cite any authority that trial court erred in omitting language).

### b.   Alleged substantive differences two through twelve

We consider the last two categories together. Regarding Mother's alleged substantive differences two through four, she challenges the following provisions in the Second SAPCR Order, which she says the MSA does not address: (1) the order provides that no party may record periods of possession unless authorized by the supervisor in advance in writing; (2) the order prohibits Mother from sending anything other than clothing or health food with M.E.H. at the end of her possession periods; and (3) the order provides that any person's right to attend possession periods may be terminated by the supervisor if that person fails to follow the supervisor's rules. These three provisions appear in the section of the Second SAPCR Order concerning professional supervision of Mother's periods of

---

[11] *See Wallace*, 2013 WL 4507843, at *8.

21

possession during step one. Mother complains that these provisions materially conflict with the arbitration decision because the arbitrator refused to award them and that they materially conflict with the MSA because they are not specifically enumerated therein.

First, we reject Mother's argument that the Second SAPCR Order substantially deviates from the arbitration decision because the arbitrator neither considered nor issued a ruling on the disputed provisions. The record does not show that Mother requested to arbitrate her dispute regarding the challenged details of supervised possession. Mother has not demonstrated that she timely raised a dispute about those terms and presented that dispute to the arbitrator or moved to compel arbitration on this matter. Mother points to the arbitrator's decision as support for her claim that the arbitrator determined that the details of the supervision rules were outside the scope of arbitration. The arbitrator's decision quotes from a December 18, 2017 letter by Mother's counsel requesting a "clarification on if the rules of the supervisor contradict the terms of the Final Order for the Final Order to supersede." The arbitrator made no decision on the issue because he considered it advisory. We do not agree with Mother's interpretation of the decision for two reasons. According to the quoted text, Mother asked the arbitrator to rule that the trial court's final order would supersede the supervisor's rules to the extent of any conflict. Contrary to Mother's view, the cited text does *not* indicate that the arbitrator was asked to resolve a drafting dispute or a dispute regarding details of supervision rules during step one possessory periods. Moreover, the December 18, 2017 letter from Mother's counsel referenced by the arbitrator does not appear in our record. Presumably, the letter identified the disputes that Mother submitted to the arbitrator. Father claims that she did not submit the matters complained of on appeal to arbitration. Because the letter is not before us, there is no way to determine, and no evidence, that Mother requested

22

arbitration of the disputed supervision rules at issue. Thus, as to alleged substantive differences two through four, we conclude that no material conflict exists between the Second SAPCR Order and the arbitration decision. There can be no conflict between those documents when the arbitrator did not decide the matters at issue.

Second, Mother has not demonstrated that the three provisions pertaining to supervision rules deviate materially from the MSA's terms. The MSA provides that Mother must "follow all written rules of the supervisor." Additionally, the MSA states:

> The supervisor will determine who is allowed at visits based on ability to supervise and all people at the visits will be required to follow the rules of the supervisor. Supervisor will release all supervision notes when completed to both parties.

Although the MSA is silent as to the specific provisions Mother identifies, the agreement reflects the parties' intent to abide by the supervisor's rules. Mother has not explained how the challenged provisions in the Second SAPCR Order substantively alter the parties' intent in signing the MSA or whether the terms "reflect the written rules of the supervisor." Mother has not provided a basis for this court to conclude that these terms vary "substantially" from the MSA or are unnecessary "to effectuate and implement the parties' agreement." *See In re Lee*, 411 S.W.3d at 458 n.17; *see also Haynes v. Haynes*, 180 S.W.3d 927, 930 (Tex. App.—Dallas 2006, no pet.). We cannot say that the trial court erred in including the identified provisions in the Second SAPCR Order.

Finally, we address alleged substantive differences five through twelve. Like the disputed provisions just discussed, the alleged differences five through twelve were never submitted to arbitration, as Mother acknowledges. Thus, there can exist no material conflict between the Second SAPCR Order and the arbitration decision as to these provisions.

Mother asserts, however, that the trial court erroneously included the challenged provisions in the order because: (1) they materially deviate from the MSA; (2) the court refused to hear evidence on Mother's objections and denied her an opportunity to make a record; and (3) the court circumvented the arbitration process called for by the MSA.

Mother presents no authority in support of these points. Tex. R. App. P. 38.1(i). To the extent alleged substantive differences five through twelve constitute drafting disputes or disputes regarding the details of the MSA—Mother presumes in her brief they are so categorized—she cannot complain that the arbitration process was "circumvented" because the record does not show that she invoked her arbitration rights. She did not file a motion to compel arbitration as to those disputed provisions, and the record does not reflect that she requested the arbitrator to consider them in her December 18, 2017 letter. *See, e.g.*, *S.C. Maxwell Family P'ship, Ltd. v. Kent*, 472 S.W.3d 341, 343 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (explaining that arbitration provisions are not "self-executing" and may be waived; party seeking to enforce arbitration provision must file a motion to compel arbitration). Further, the record does not show that Mother timely objected to the inclusion of the specific provisions at issue before the court signed the Second SAPCR Order. Had she done so, Father could have asserted his right to arbitrate those disputes.

Additionally, Mother does not explain how the seven provisions identified substantively alter the parties' intent or deviate substantially from the MSA's terms such that they are unnecessary "to effectuate and implement the parties' agreement." *See In re Lee*, 411 S.W.3d at 458 n.17; *see also Haynes*, 180 S.W.3d at 930. Thus, she has not shown that the trial court erred on the ground that the Second SAPCR Order substantially deviates from the MSA.

Finally, because Mother has not presented authority or argument demonstrating that the court abused its discretion because it considered the Second SAPCR Order on submission without an oral hearing, or that she raised a timely objection to that process, she has not shown a right to reversal on that ground. *See* Tex. R. App. P. 33.1, 38.1(i). Mother contends that the trial court "refused to hear evidence on [her] objections," but the reporter's record pages cited do not support her assertion. At the hearing, Mother's counsel informed the trial court that Mother disputed some portions of Father's proposed final order, but Mother did not bring to the court's attention the specific disputes she raises here.

We overrule Mother's second issue.

## Conclusion

Having overruled both of Mother's appellate issues, we affirm the Second SAPCR Order.

/s/    Kevin Jewell
Justice

Panel consists of Justices Wise, Jewell, and Poissant.